IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | CASE NO. BK19-80120 |
| SCOTT RYAN LONGNECKER and | ) | |
| HEATHER RENEE LONGNECKER, | ) | CHAPTER 7 |
| | ) | |
| Debtor(s). | ) | |

## ORDER

Hearing was held on April 8, 2019, on the Chapter 7 trustee's motion for turnover (Fil. No. 15) and resistence by the debtors (Fil. No. 18), and on the Chapter 7 trustee's objection to exemptions (Fil. No. 16) and resistance by the debtors (Fil. No. 17). John T. Turco appeared for the debtors, and Brian S. Kruse appeared as Chapter 7 trustee. Post-hearing briefs and stipulated facts have been filed, and the matter is now ready for decision.

For the reasons that follow, the trustee's objection to exemptions is granted, and the motion for turnover is granted in part.

### *BACKGROUND*

The Chapter 7 trustee in this bankruptcy case seeks the turnover of and denial of an exemption in the debtor Scott Longnecker's shares of his employer's stock incentive plan. At issue is the value of 373 restricted shares of stock granted over the previous four years by Mr. Longnecker's employer in its stock incentive plan. The Longneckers characterize the shares as partially vested because the restricted shares do not fully vest until 48 months after receipt, as an incentive for employees' continued employment with the company and adherence to certain standards. The Longneckers value the "partially vested" shares at approximately $33,000 as of the petition date and maintain that the as-yet unvested value of the shares (approximately $27,000 on the petition date) is not property of the bankruptcy estate. They claim the majority of the "partially vested" value exempt as earnings under Neb. Rev. Stat. § 25-1558(4)(a), and the balance under the personal property exemption of Neb. Rev. Stat. § 25-1552.

The Chapter 7 trustee challenges the Longneckers' characterization of the shares as exemptible earnings, as well as their choice to include only the vested portion of the shares as property of the estate. The trustee does not take issue with the use of the personal property exemption.

A debtor's bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Bankruptcy Code allows a debtor to exempt certain property from the bankruptcy estate. § 522(b). "[E]xemptions represent the debtor's attempt to reclaim those assets, or more often, certain interests in those assets, to the creditors' detriment." *Schwab v. Reilly*, 560 U.S. 770, 785 (2010). Under § 522(b), a state may opt

out of using the federal exemptions listed in § 522(d). "A debtor whose domicile is in a state that has opted out of the federal Bankruptcy Code exemptions is limited to the exemptions applicable under federal law other than § 522(d) and the laws of such state and locality. 11 U.S.C. § 522(b)(2) and (3)." *Moon v. Hurd (In re Hurd)*, 441 B.R. 116, 119 (B.A.P. 8th Cir. 2010). In this case, the debtors are domiciled in Nebraska, which has opted out of the federal exemptions. Neb. Rev. Stat. § 25-15,105.[1] Accordingly, state law governs the exemptions. *Hurd*, 441 B.R. at 119 (citing *Norwest Bank Nebraska, N.A. v. Tveten (In re Tveten)*, 848 F.2d 871, 873 (8th Cir. 1988)).

As the objecting party, the trustee bears the burden of proving that the exemptions are not properly claimed. Fed. R. Bankr. P. 4003(c).

## UNDISPUTED FACTS

For purposes of this motion and objection, the parties agree on the following facts:

1.  The debtors, Scott and Heather Longnecker, filed for Chapter 7 bankruptcy protection on January 25, 2019.

2.  The dispute includes whether the Nebraska wage exemption statute, Neb. Rev. Stat. § 25-1558, is applicable to certain stock of Scott Longnecker's employer, Union Pacific Corporation ("UP"), called "Retention Shares." Specifically, section 4 of that statute provides in relevant part:

> For the purposes of this section:
> (a) Earnings shall mean compensation paid or payable by an employer to an employee for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program;
> (b) Disposable earnings shall mean that part of the earnings of an individual remaining after the deduction from those earnings of amounts required by law to be withheld[.]

3.  Before filing for bankruptcy protection, Mr. Longnecker was granted the following shares of UP common stock known as Retention Shares:

---

[1]That section provides as follows:

The federal exemptions provided in 11 U.S.C. 522, subsection (d), are hereby rejected by the State of Nebraska. The State of Nebraska elects to retain the personal exemptions provided under Nebraska statutes and the Nebraska Constitution and to have such exemptions apply to any bankruptcy petition filed in Nebraska after April 17, 1980.

  a.  121 shares granted on February 8, 2018 per Grant No. 105321;

  b.  84 shares granted on February 2, 2017 per Grant No. 101341;

  c.  120 shares granted on February 4, 2016 per Grant No. 098730; and

  d.  48 shares granted on February 5, 2015 per Grant No. 096508.

4. The Retention Shares were issued per the UP 2013 Stock Incentive Plan (the "Plan"), per UP Grant Notices for 2013 Stock Incentive Plan Retention Shares (each a "Grant Notice"), and per Standard Terms and Conditions for Retention Shares (the "Standard Terms").

5. The Longneckers claimed the Retention Shares as exempt in an amount equal to $33,216.60 per Neb. Rev. Stat.§ 25-1558. The trustee objected to the exemption.

6. The Retention Shares are property of the bankruptcy estate.

7. According to the terms of the Plan, every UP employee, including an officer or director who is such an employee, is an eligible participant of the Plan. However, for purposes of this proceeding only, it is stipulated that only management employees historically have been awarded retention shares by UP.

8. The shares are not transferable other than by will or inheritance.

9. According to its terms, the Plan is intended to "strengthen the Company's ability to drive performance which enhances long term shareholder value; to increase employee stock ownership; and to strengthen the Company's ability to attract and retain an outstanding employee and executive team." Plan § 1 (Ex. A to Fil. No. 25). If called, Mr. Longnecker would testify that from a management employee's perspective, the retention stock is mainly used to keep employees from leaving the company for other opportunities.

10. The Retention Shares are not stock options.

  a.  The Plan defines Retention Shares and Options differently. Retention Shares are "an Award or issuance of Common Stock the grant, issuance, retention, vesting and/or transferability of which is subject during specified periods of time to such conditions (including continued employment or performance conditions) and terms as the Committee deems appropriate." Plan § 2(y) (Ex. A to Fil. No. 25).

  b.  An "Option" under the Plan is "a right to purchase a number of shares of Common Stock at such exercise price, at such times and on such other terms and conditions as are specified in or determined pursuant to an Award Agreement." *Id.* at § 2(s).

11.    Mr. Longnecker receives compensation from UP. On Schedule I, he scheduled his monthly income as $9,419.70, including the anticipated annual Retention Share income. In 2018, Mr. Longnecker averaged $8,821.84 per month in Cash Earnings. Debtors are required to list all sources of income on Schedule I of the bankruptcy schedules and on the Means Test. Mr. Longnecker's standard hourly wage varies from month to month but generally averages $31.25.

12.    The Plan and Standard Terms awarding the Retention Shares provide that Mr. Longnecker is the holder of record of the Retention Shares, which are registered in his name. Said documents provide that Mr. Longnecker has the entire beneficial ownership interest in, and all right and privileges of a shareholder as to, all Retention Shares. He has the right to receive dividends and the right to vote the Retention Shares. The Retention Shares are subject to the limitations and restrictions set forth in the following paragraph. *See* Plan § 7(c) (Ex. A. to Fil. No. 25); Standard Terms § 1 (Ex. A to Fil. No. 17).

13.    Mr. Longnecker is not entitled to the physical delivery of the Retention Shares until after a "Restriction Period Termination Date," which for each grant of Retention Shares ("Grant") occurs four years after the date of the Grant. Standard Terms § 4 (Ex. A to Fil. No. 17). The first Restriction Period Termination Date passed on February 5, 2019, which was post-petition. The Retention Shares are not performance-based compensation and were not issued subject to any performance criteria. The committee that granted the shares had the power to impose performance criteria per the terms of the Plan. *See* Plan §§ 10(a) and 12 (Ex. A. to Fil. No. 25).

14.    With some exceptions that have not occurred to date, the Retention Shares may be forfeited, and Mr. Longnecker's rights terminated, unless Mr. Longnecker remains in continuous employment of UP for the entire Restriction Period. Standard Terms§ 1 (Ex. A to Fil. No. 17).

15.    The committee that awarded the Retention Shares has the power to waive any restrictions. Plan § 6(b) (Ex. A. to Fil. No. 25).

16.    The Retention Shares are to be delivered within 30 days after the date all restrictions lapse. Standard Terms § 4 (Ex. A to Fil. No. 17).

17.    UP shall not deliver the Retention Shares until Mr. Longnecker makes satisfactory arrangements to satisfy all applicable tax withholding obligations. Standard Terms § 18 (Ex. A. to Fil. No. 17). Mr. Longnecker must arrange for the payment of such obligations promptly after notice from UP as to the amount to be withheld. *Id.* The Plan allows UP to make the withholding from Mr. Longnecker's pay. *Id.*

18.    The Plan allows Mr. Longnecker to make an election under 26 U.S.C. § 83(b) to pay the withholding obligations either at the time the shares are granted or after the shares are delivered. *Id.* If Mr. Longnecker elects to pay the tax when the shares are granted, the Plan allows for shares to be withheld to pay the withholding obligations. *Id.*

19.    The retention stock is included in UP's compensation statement to Mr. Longnecker.

## *DISCUSSION*

The parties agree that the court needs to decide two legal issues to resolve this matter:

1.    Do Mr. Longnecker's Retention Shares constitute "earnings subject to garnishment" pursuant to Neb. Rev. Stat. § 25-1558(a) and can he exempt his interest in the Retention Shares under that section?

2.    As of the petition date, did Mr. Longnecker own, free and clear of any interest of the bankruptcy trustee, as his separate future earnings or personal property, a proportional share of the Retention Shares that had yet to meet the Restriction Period Termination Date for each relevant batch of shares that were granted, irrespective of Neb. Rev. Stat. § 25-1558?

***Are the Retention Shares earnings subject to garnishment that can be exempted under Neb. Rev. Stat. § 25-1558(a)?***

The trustee's position on the fundamental inapplicability of the garnishment exemption statute[2] to this case because there has been no garnishment seems to be an effort to reverse a long-

---

[2]The statute in its entirety is as follows:

25-1558. Wages; subject to garnishment; amount; exceptions

(1) Except as provided in subsection (2) of this section, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment shall not exceed the lesser of the following amounts:
    (a) Twenty-five percent of his or her disposable earnings for that week;
    (b) The amount by which his or her disposable earnings for that week exceed thirty times the federal minimum hourly wage prescribed by 29 U.S.C. 206(a)(1) in effect at the time earnings are payable; or
    (c) Fifteen percent of his or her disposable earnings for that week, if the individual is a head of a family.

(2) The restrictions of subsection (1) of this section shall not apply in the case of:
    (a) Any order of any court for the support of any persons;
    (b) Any order of any court of bankruptcy under Chapter XIII of the Bankruptcy Act; or
    (c) Any debt due for any state or federal tax.

(3) No court shall make, execute, or enforce any order or process in violation of this
(continued...)

standing tradition in this district of permitting debtors to exempt accrued wages under § 25-1558 regardless of whether a garnishment has occurred. *See, e.g.*, *Pruss v. Butler (In re Pruss)*, 235 B.R. 430 (B.A.P. 8th Cir. 1999) (permitting self-employed debtor to exempt accounts receivable), *vacated on procedural grounds*, 255 B.R. 314 (B.A.P. 8th Cir. 2000); *In re Cerda*, Case No. BK07-41500, 2007 WL 4893451 (Bankr. D. Neb. Dec. 6, 2007) (sustaining trustee's objection to exemption because the money at issue was not compensation from an employer); *In re Alcorn*, Case No. 13-50026, 2013 WL 3353837, at *2 (Bankr. D.S.D. July 3, 2013) (citing *Cerda* for the proposition that "contrary to Trustee Allred's position, the exemption set forth in [Neb. Rev. Stat. § 25-1558] appears to be available to debtors in bankruptcy, even if the debtor's wages are not being garnished.").

_____

[2](...continued)
section. The exemptions allowed in this section shall be granted to any person so entitled without any further proceedings.

(4) For the purposes of this section:
        (a) Earnings shall mean compensation paid or payable by an employer to an employee for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program;
        (b) Disposable earnings shall mean that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld;
        (c) Garnishment shall mean any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt; and
        (d) Head of a family shall mean an individual who actually supports and maintains one or more individuals who are closely connected with him or her by blood relationship, relationship by marriage, by adoption, or by guardianship, and whose right to exercise family control and provide for the dependent individuals is based upon some moral or legal obligation.

(5) Every assignment, sale, transfer, pledge, or mortgage of the wages or salary of an individual which is exempted by this section, to the extent of the exemption provided by this section, shall be void and unenforceable by any process of law.

(6) No employer shall discharge any employee by reason of the fact that his or her earnings have been subjected to garnishment for any one indebtedness.

(7) In the case of earnings for any pay period other than a week, the Commissioner of Labor shall by regulation prescribe a multiple of the federal minimum hourly wage equivalent in effect to that set forth in this section.

A number of other districts also permit their garnishment exemption statutes to be used in bankruptcy cases where no garnishment has occurred. *See, e.g.*, *In re Johnson*, 593 B.R. 331 (Bankr. D.N.M. 2018); *In re Delima*, 561 B.R. 647 (Bankr. E.D. Va. 2016); *In re Seifert*, 544 B.R. 670 (Bankr. D. Minn. 2016); *In re Bell*, 526 B.R. 288 (Bankr. N.D. Ind. 2015); *In re Holmes*, 414 B.R. 868 (Bankr. S.D. Fla. 2009); *In re Merrill*, 431 B.R. 239 (Bankr. D. Id. 2009); *In re Kramer*, 339 B.R. 761 (Bankr. D. Colo. 2006); *In re Jones*, 318 B.R. 841 (Bankr. S.D. Ohio 2005); *Forker v. Irish (In re Irish)*, 311 B.R. 63 (B.A.P. 8th Cir. 2004) (interpreting Iowa law); *In re Urban*, 262 B.R. 865 (Bankr. D. Kan. 2001).

Other courts have reached the opposite conclusion and have held that similar wage garnishment exemption statutes do not create a general exemption in bankruptcy cases. *See, e.g.*, *In re Mordkin*, Case No. 10-1094, 2011 WL 612073 (Bankr. D.D.C. Feb. 11, 2011); *In re Parsons*, 437 B.R. 854 (Bankr. E.D. Mo. 2010); *In re Thum*, 329 B.R. 848 (Bankr. C.D. Ill. 2005).

Guidelines to help courts assess the scope of exemption statutes exist in the Eighth Circuit because the Court of Appeals has explained the particular meaning of exemptions in the bankruptcy arena:

> "Exemption" is a term of art in bankruptcy, and we agree with the dissenting judge of the B.A.P. that "[w]hile exemption may mean different things in different contexts, in the context of [11 U.S.C.] § 522, it refers to laws enacted by the legislative branch which explicitly identify property [that] judgment-debtors can keep away from creditors for reasons of public policy." *Benn v. Cole (In re Benn)*, 340 B.R. 905, 914 (B.A.P. 8th Cir. 2006) (Kressel, J., dissenting).

*Benn v. Cole (In re Benn)*, 491 F.3d 811, 814 (8th Cir. 2007).

The courts that have found wage garnishment statutes to be separate and distinct from bankruptcy exemption statutes emphasize the differing purposes behind wage garnishment limitations and exemptions from attachment and execution, and they point to legislative ability to draft specific statutory language. As the Illinois bankruptcy court explained in *Thum*, the Illinois Legislature "has a demonstrable pattern, when creating an exemption, of using language that unequivocally protects the identified property against any and all debt collection mechanisms." 329 B.R. at 853. In contrast, the court said, the wage garnishment statute is much narrower in scope and merely caps the maximum amount an employer may withhold pursuant to a court order. "It is only by implication that the [debtor] construes that withholding ceiling as a general exemption for the portion of accrued wages that are nongarnishable." *Id.*

Likewise, the *Parsons* court ruled that because exemption statutes must "explicitly identify property that a judgment-debtor can keep away from creditors" pursuant to *Benn*, Missouri's garnishment statute is not an exemption statute, as it does not explicitly exempt wages but simply "regulate[s] the enforcement of garnishment orders." 437 B.R. at 857.

When considering the applicability of an exemption statute, "the starting point with all exemptions is clear – the specific exemptions are to be liberally construed in favor of the person claiming the exemption." *In re Welborne*, 63 B.R. 23, 26 (Bankr. D. Neb. 1986) (citing Richard F. Duncan, *Through the Trapdoor Darkly: Nebraska Exemption Policy and the Bankruptcy Reform Act of 1978*, 60 Neb. L. Rev. 219, 267 (1981)).

As the parties are aware, Nebraska's exemption statutes have long been liberally construed in favor of the debtor. *In re Bailey*, 172 F. Supp. 925, 927 (D. Neb. 1959). "Statutory exemption laws are founded upon public policy. Each state has a right, as well as a duty, to protect an unfortunate head of a family from having all his property taken from him and he be forced to become a charge upon the taxpayers." *State ex rel. Sorensen v. Bank of Crab Orchard (In re Application of Laflin)*, 239 N.W. 836, 837-38 (Neb. 1932).

*In re Quintero*, No. BK12-81257-TJM, 2012 WL 3638504, at *1 (Bankr. D. Neb. Aug. 22, 2012).

In contrast to these cases where the wage garnishment statute was employed in the bankruptcy context "by implication" from other statutes (*Thum*) or developed "in practice and . . . without objection" (*Parsons*), the Nebraska statutory scheme specifically includes it among the permitted exemptions from attachment and execution. As noted previously, the Nebraska legislature opted out of the federal bankruptcy exemption statutes, electing "to retain the personal exemptions provided under Nebraska statutes and the Nebraska Constitution and to have such exemptions apply to any bankruptcy petition filed in Nebraska[.]" Neb. Rev. Stat. § 25-15,105. The wage garnishment statute is included in the "Exemptions" section of Article 15, concerning executions and exemptions. While its language is derived from the federal Consumer Credit Protection Act, 15 U.S.C. § 1671 *et seq.*, and therefore is unlike the Nebraska statutes explicitly identifying specific property which is protected from debt collection mechanisms, such as § 25-1556 (exempting, *inter alia*, a debtor's immediate personal possessions and up to $5,000 in a motor vehicle), the garnishment statute is incorporated into § 25-1552, which specifically exempts $5,000 in non-wage personal property *and* expressly states that "[t]he provisions of this section do not apply to the exemption of wages, that subject being fully provided for by section 25-1558."

The language used by the legislature in § 25-1552 evidences its intent to explicitly identify the portion of a debtor's earnings that are meant to be exempt from any debt collection activities. The wage garnishment statute is not limited only to occasions where a garnishment has occurred, and its use to exempt assets in bankruptcy cases is not simply by implication or traditional-but-unchallenged practice. Instead, its broad application is legislatively sanctioned. Therefore, § 25-1558 may appropriately be used to exempt a percentage of a debtor's earnings from property of the bankruptcy estate.

The next question is the scope of "earnings" under that statute and whether any portion of Mr. Longnecker's Retention Shares are protected as a result. Mr. Longnecker provided evidence in the form of a declaration – after the parties had submitted their joint stipulation of facts – setting

forth how UP, as part of a company-wide effort to reduce operating expenses, has since late 2015 increased awards of Retention Shares to offset reduced salary increases for eligible employees. Longnecker Decl. (Fil. No. 42). Thus, it seems clear that Mr. Longnecker received the shares as his earnings.

However, the fact that the shares were awarded as part of Mr. Longnecker's earnings does not make them subject to garnishment. "'Just because some property interest had its source in wages . . . does not give it special protection, for to do so would exempt from the bankrupt estate most of the property owned by many bankrupts, such as savings accounts and automobiles which had their origin in wages.'" *Kokoszka v. Belford*, 417 U.S. 642, 648 (1974) (quoting *In re Kokoszka*, 479 F.2d 990, 995 (2d Cir. 1973)).

Awards of Retention Shares are governed by the Grant Notices and the Standard Terms and Conditions established by Mr. Longnecker's employer. Paragraph 1 of the Standard Terms states in part:

> The Participant shall have the entire beneficial ownership interest in, and all rights and privileges of a shareholder as to, such Retention Shares, including the right to receive dividends and the right to vote such Retention Shares but shall not be entitled to delivery of the Common Stock until the Restriction Period Termination Date[.]

Standard Terms § 1 (Ex. A to Fil. No. 17).

In all respects, Mr. Longnecker has already received the award of the Retention Shares as his earnings and they are not subject to being "withheld"[3] under the terms of the garnishment statute. While they may have been earnings when he received them, they are no longer earnings owed to him that are subject to garnishment. He is the owner of the Retention Shares and enjoys all the rights and privileges of that ownership, subject to the forfeiture restriction. Mr. Longnecker is also responsible for paying income taxes on the Retention Shares, either in the year the stock was awarded or the year the stock is no longer subject to a substantial risk of forfeiture. The taxes may be withheld from Mr. Longnecker's paycheck.

The Retention Shares are simply restricted stock owned by the debtor – they are no longer wages or earnings owed to the debtor, nor are they receivables. The situation is not significantly different from that of a hypothetical debtor who is paid a signing bonus upon hiring (prior to bankruptcy) with the stipulation that the signing bonus is subject to forfeiture or return if the debtor does not remain employed with the company for a certain number of years. The hypothetical debtor receives that money as earnings, paying taxes on it and depositing it into a bank account. When that debtor later files bankruptcy, the signing bonus is simply cash which may be claimed by the bankruptcy trustee, subject to a wildcard or other exemption. As noted by the Second Circuit and the

---

[3]As more fully set forth in footnote 2, garnishment means any legal or equitable procedure through which the earnings of any individual are required to be "withheld" for payment of a debt.

Supreme Court in *Kokoszka*, personal property cannot be exempted in bankruptcy simply because it derives from a debtor's wages. 417 U.S. at 648. "As a practical matter, to hold that property that can be traced back to wages can assume status as earnings which can therefore be exempt in bankruptcy borders on a slippery slope whereby the potential for inconsistency and uncertainty would be infinite." *Parsons*, 437 B.R. at 857.

### *As of the petition date, did Mr. Longnecker own a proportional share of the Retention Shares that had yet to meet the applicable Restriction Period Termination Dates free and clear of any interest of the bankruptcy trustee?*

Despite the broad grant of ownership rights in paragraph 1 of the Standard Terms, paragraph 2 of the same document says the Retention Shares shall not become "vested" until the Restriction Period Termination Date for each grant notice. Standard Terms § 2 (Ex. A to Fil. No. 17). Therefore, since the Retention Shares were not fully vested as of the petition date, their value should be prorated between the trustee and the Longneckers.

The Eighth Circuit Court of Appeals decision of *Stoebner v. Wick (In re Wick)*, 276 F.3d 412 (8th Cir. 2002), is relevant here. In *Wick*, the debtor had received a contingent stock option[4] as a result of the sale of her company about four months prior to filing a Chapter 7 bankruptcy petition. Under the terms of sale, the debtor would receive a 24.5 percent share of the company's stock if she remained employed by the company for one year following the sale. On her bankruptcy schedules, she listed this personal property asset with an unknown value. She also listed it as exempt under the federal "wildcard" exemption, stating that both the value of the asset and the value of the exemption were unknown.

The Chapter 7 trustee for Ms. Wick's case inquired about this asset at the § 341 meeting, but did not file an objection to the exemption. After Ms. Wick received a discharge, the trustee followed up with her to see if she had exercised her stock-option rights. At the time, she claimed she had tried to but was denied. However, she subsequently did receive the stock certificates and thereafter sued in state court to force the company to buy out her shares. The trustee then asserted a claim to the stock rights. When the state court ordered a buyout of Ms. Wick's shares of stock and valued them at $97,200, the trustee reopened the bankruptcy case and moved for turnover of the $97,200 less the exemption of $3,925.

The bankruptcy court ruled that the estate was entitled to one-third of the stock's value less the exemption amount, based on the calculation that the stock-option rights were one-third vested as of the petition date (because Ms. Wick had worked for four of the twelve months required under her employment agreement at the time she filed bankruptcy). The court said the remaining two-thirds

---

[4]It is unclear why the court referenced Ms. Wick's rights as an "option" when the description of her right to receive the shares is not that of a typical option (where after a date certain, the holder of the option has the right to pay a fixed amount to purchase shares). In any event, the actual terminology used by the court will be used here.

The Longneckers set forth that calculation as applied to the Retention Shares in their bankruptcy schedules:

> [Using] the stock value of $160.83 (symbol: UNP) on or about 10:40 a.m. CST, 1/25/2019, the estate's interest is calculated as follows:
>
> 2/5/2015, Debtor was granted 48 shares of Union Pacific restricted stock. Termination of this restriction is 2/5/2019. (48 months total vesting time; the debtor is at the end of month 47 so is 99% earned/vested)
> $$160.83 \times 48 = \$7,719.84 \times 99\% = \$7,642.64.$$
>
> On 2/4/2016, Debtor was granted 120 shares of Union Pacific restricted stock. Termination of this restriction is 2/4/2020. (48 months total vesting time; the debtor is at the end of month 35; this is 74% earned/vested)
> $$160.83 \times 120 = \$19,299.60 \times 74\% = \$14,281.70.$$
>
> On 2/2/2017, Debtor was granted 84 shares of Union Pacific restricted stock. Termination of this restriction is 2/2/2021. (48 months, the debtor is at the end of month 23; this is 49% earned/vested)
> $$160.83 \times 84 = \$13,509.72 \times 49\% = \$6,619.76.$$
>
> On 2/8/2018, Debtor was granted 121 shares of Union Pacific restricted stock. Termination of this restriction is 2/8/2022. (48 months, the debtor is at the end of month 11; this is 24% earned/vested)
> $$160.83 \times 121 = \$19,460.43 \times 24\% = \$4,670.50.$$
>
> Estimated total partially vested/earned total: $33,214.60.

Attachment 1 to Schedule A/B (Fil. No. 1 at 17).

The trustee has not challenged those calculations, so they will be accepted as an accurate valuation of Mr. Longnecker's restricted ownership interest in the Retention Shares as of the date of bankruptcy filing.

### *CONCLUSION*

In sum, the Nebraska garnishment exemption statute may be used to exempt accrued wages or other earnings owed to a debtor in bankruptcy even when no garnishment has occurred. However, Mr. Longnecker's Retention Shares (subject to restrictions) have already been paid to him and are his personal property. They are not earnings that can be subject to garnishment and may not be exempted under Neb. Rev. Stat. § 25-1558. However, since the restriction time periods had not expired as of the bankruptcy filing date, Mr. Longnecker may prorate their value under the *Wick*

analysis for purposes of valuing his interest in the shares as property of the bankruptcy estate. The value of the Retention shares as of the filing date is $33,214.60.

IT IS ORDERED: The Chapter 7 trustee's objection to exemptions is granted. The Chapter 7 trustee's motion for turnover (Fil. No. 15) is granted in part. The debtors shall turn over to the trustee $33,214.60, less any applicable personal property exemption of Neb. Rev. Stat. § 25-1552.

DATED: June 26, 2019.

BY THE COURT:

/s/Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *Brian S. Kruse
    John T. Turco
    United States Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.

-13-